UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RECEIVED
UNITED STATES DIST. CLERK

2006 SEP 15  P 12: 02

UNITED STATES
DISTRICT COURT

|  |  |
|---|---|
| SADIQ SARWARI, *et al* | : |
| | : |
| Plaintiffs, | : |
| v. | : |
| | : |
| BP PRODUCTS NORTH AMERICA, | : |
| INC. | : |
| | : |
| Defendant, | : |

**Hon. Dennis M. Cavanaugh**

**OPINION**

Civil Action No. 06-2976 (DMC)

DENNIS M. CAVANAUGH, U.S. District Judge

This matter comes before the Court on Plaintiffs' application for a preliminary injunction. After careful review of all papers filed and oral arguments of counsel heard, for the reasons set forth below, Plaintiffs' application is **granted.**

FACTUAL BACKGROUND

Defendant, British Petroleum Products North America, Inc. ("BP") is engaged in, among other things, the sale of motor fuel and other petroleum products. Plaintiffs are twenty-eight New Jersey residents engaged in the business of selling Defendant's brand of gasoline at the retail level. Defendant does not own and operate all of the BP-branded service stations located in New Jersey. Rather, BP stations are operated through several different business arrangements with independent dealers such as the Plaintiffs.

One such arrangement is called a "lessee-dealer" agreement. Under the lessee-dealer arrangement, BP owns the property or the lease for a station, but an independent dealer operates the gas station pursuant to a lease with BP. The lessee-dealer buys fuel from BP and independently sets the retail price of the gasoline for sale to its customers.

Another business arrangement offered by BP to its dealers is called the "commission marketer" agreement. The commission marketer plan calls for the retail dealer to sell gas owned by BP at a price set by BP. The dealer then receives a set commission on each gallon of fuel sold.

During much of the 1980s, many of the Plaintiffs operated fuel stations with BP or its predecessor under the lessee-dealer arrangement. In accordance with that type of arrangement, Plaintiffs purchased gasoline, individually set the retail price of the gasoline and sold the fuel to the public. Plaintiffs operated BP gasoline stations pursuant to this arrangement from the 1980s until, in some cases, as late as 2003.

Plaintiffs and Defendant acknowledge that the aforementioned arrangements constitute a franchisor-franchisee relationship.

In the 1990s, certain of the twenty-eight Plaintiffs were no longer able to operate their respective gasoline stations profitably. As a result, some of them entered into a four-year commission marketer arrangement with Defendant. Other Plaintiffs, however, maintained the lessee-dealer arrangement with BP. Those Plaintiffs who switched to the commission marketer arrangement renewed for an additional four year period in 2003.

On or about June 1, 2006, BP notified its dealers, including Plaintiffs, that BP "ha[d] determined in good faith and in the normal course of business to withdraw the commission

2

marketer channel of trade in the New Jersey area." The letter explained that the commission marketer agreements would be "terminated effective September 5, 2006, as provided by Section 23.A.15 of your CM Agreement and Section 19.A.13 of your CM Lease."

In a letter dated June 1, 2006, BP memorialized its intent to end the commission marketer arrangement with Plaintiffs. In accordance with the commission marketer agreements, BP offered Plaintiffs an option to continue their relationship with BP as lessee-dealers. This letter explained that each Plaintiff must elect to switch to a lessee-dealer. Alternatively, BP offered each Plaintiff the "second option that would allow [Plaintiffs] to continue [their] franchise relationship." BP offered each Plaintiff the opportunity to purchase BP's interest in the service station's underlying ground lease and to purchase BP's equipment and assets at each service station.

The letter concludes by explaining that each Plaintiff who fails to elect either of the two options must conclude his or her business affairs and quit and deliver possession of the fuel stations with all BP-owned equipment on or before September 5, 2006; a termination of the franchise.

Plaintiffs argue that neither of the options presented by BP is viable and that both will ultimately lead to the financial collapse of their gas station operations. Plaintiffs further argue that the options in the June 1, 2006, letter are illusory and that BP's real aim is to force them out of business. They believe that the action taken by BP illegally terminates the franchise agreement.

On June 28, 2006, Plaintiffs filed a complaint seeking immediate injunctive relief with respect to the July 3, 2006, deadline to elect the lessee-dealer option and a preliminary injunction

3

with respect to the deadline to purchase the gas stations outright from BP[1]. The June 28, 2006, complaint was dismissed as premature. Plaintiffs filed an amended complaint on August 7, 2006, claiming that BP violated the New Jersey Franchise Practices Act ("Franchise Act") and the covenant of good faith and fair dealing, again seeking injunctive relief.

Defendant argues that it is merely exercising its right under the commission marketer agreements to switch the business arrangements back to lessee-dealer agreements, and that they are not terminating the agreements, but rather changing the terms.

DISCUSSION

### A.    Standard Governing Issuance of an Injunction

To obtain a preliminary injunction, Plaintiffs have the burden of proving the following four factors: (1) that the moving party can demonstrate success on the merits of their underlying claims; (2) that the moving party will be irreparably harmed absent injunctive relief; (3) the possibility of harm to other interested persons; and (4) that the injunction will not negatively effect the public interest. Hoxworth v. Blinder, Robinson & Col, Inc., 903 F.2d 187, 197-98 (3d Cir. 1990).

### B.    Likelihood of Success on the Merits

The Franchise Act, N.J.S.A. 56-10-1, *et seq.*, protects franchisees from unilateral termination of the franchise relationship without good cause by franchisors. Its drafters sought to "rule out arbitrary and capricious cancellation of franchises while preserving the right of

---

[1] As a result of Plaintiffs' decision to file this suit, BP extended the dealer option deadline through September 5, 2006. Following a telephone conference, this Court extended both deadlines through September 11, 2006, the return date for the preliminary injunction hearing.

franchisors to safeguard their interests through the application of clear and nondiscriminatory standards. Assembly Bill 2063 (1971).   Plaintiffs argue that the Franchise Act affords them protection from the termination of the relationship  with BP.  Defendant concedes that the Plaintiffs qualify as franchisees pursuant to the terms of the Franchise Act.

The Franchise Act provides, in pertinent part

> It shall be a violation of this act for any franchisor directly or indirectly through any officer, agent, or employee to terminate, cancel, or fail to renew a franchise without having first given written notice setting forth all the reasons for such termination, cancellation or intent not to renew to the franchisee at least 60 days in advance of such termination, cancellation, or failure to renew . . . It shall be a violation of this act for a franchisor to terminate, cancel, or fail to renew a franchise without good cause.  For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise.

N.J.S.A. 56:10-5.

Under New Jersey law, the franchise relationship may only be terminated upon finding of "good cause," which in turn means finding that the franchisee has failed to substantially perform his obligation under the franchise contract.  Amerada Hess Corp. v. Quinn, 143 N.J. Super.237, 250 (Law Div. 1975).

The Franchise Act does not contemplate "good faith" or "normal business course" reasons  as "good cause" under its terms.  Instructional Systems, Inc. v. Computer Curriculum Corp., 130 N.J. 324, 340 (1992).  In short, "[i]t is a violation of the [Franchise Act] to cancel a franchise for any reason other than the franchisee's substantial breach, even if the franchisor acts in good faith and for a bona fide reason."  Atlantic City Coin & Slot Serv. v. IGT, 14 F. Supp. 2d 644, 658 (citing Westfield Centre Serv., Inc. v. Cities Serv. Oil Co., 86 N.J. 453, 469 (1981)).

See Belowitz v. General Motors Corp., 233 F. Supp 2d, 631 (D.N.J. 2002) (change in business

strategy does not constitute good cause under the [Franchise] Act).

Defendant argues there is no violation of the Franchise Act  because BP is not terminating

or limiting the businesses of any of the Plaintiffs.  Rather, BP argues that it is merely switching

the channel of trade to one that is commonly used and widely accepted throughout the industry (a

leasing agreement as opposed to a commission agreement), an act which the commission

marketer agreements specifically permit BP to do.

The commissioner marketer agreement between BP and Plaintiffs explains, in pertinent part:

> 23. TERMINATION AND NONRENEWAL
>> A.  If any of the following events occur, BP may terminate or nonrenew this Agreement upon ninety (90) days written notice or such shorter notice as is reasonable under the circumstances or otherwise required by state law:
>>
>>> 15)  Decision by BP to withdraw from Commission Marketer operations in the geographic area of the Facility.  In the event BP specifically designates its decision to withdraw from Commission Marketer operations as the grounds for termination and BP has not also decided to withdraw from marketing through lessee-dealers in the geographic area of the Facility, BP shall offer Marketer the option to become a marketer on BP's then current forms.

Commission Marketer Agreement, § 23.A.15

To be sure, this Court's duty "is to enforce the [agreement] as written, not ... write for the

parties a different or better contract."  Freedman Truck Ctr., Inc. v. General Motors Corp., 784 F.

Supp. 167, 178 (D.N.J. 1992).  However, the Franchise Act modifies the termination provisions

6

of all franchise agreements governed by New Jersey law, in that even if the terms of a private

franchise agreement permit termination at will, [the Franchise Act's] good cause requirement

will supersede that arrangement and impose a good cause requirement on the franchisor's

decision. <u>General Motors Corp. v. New A.C. Chevrolet, Inc.</u>, 263 F. 3d  296, 319 (3d Cir. 2001).

"This is because the [Franchise Act] was enacted in large part to counteract the unequal

bargaining power between franchisor and franchisee, which would allow a franchisor to leverage

its bargaining strength so as to insert provisions in its private agreements with franchisees that

would allow it to sever the franchise relationship." <u>Id</u>.        Therefore, the terms in the

commission marketer agreement which allow BP to withdraw the agreement unilaterally will be

given no weight by this Court because those express provisions are in violation of the Franchise

Act.

      Defendant also contends that it is not terminating the relationship with the Plaintiffs at all.

BP argues that it is offering Plaintiffs the opportunity to continue the business relationship, and is

merely seeking to adjust the terms of that relationship so that BP and its dealers are more in line

with commonly accepted methods of selling gasoline throughout New Jersey.  BP takes the

position that Plaintiffs cannot carry the burden of showing a likelihood of success under the

Franchise Act because BP has not terminated, cancelled or failed to renew the Plaintiffs'

franchise agreements.  Rather, BP maintains that its intention with respect to the Plaintiffs is to

merely change the nature of the relationship between the parties.  Specifically, the channel of

distribution of its product.

      In interpreting the New Jersey Franchise Act, the Eastern District of New York issued a

preliminary injunction in favor of the franchisees because it found that the "clear intent behind

7

[the franchisor's] new dealer arrangement is to streamline its marketing system . . . in order to more profitably exist in a changing marketplace.  Any argument that the new agreement merely works a 'change' is, in the court's opinion, nothing more than a poorly disguised euphemism for what is essentially a termination or failure to renew this distributorship agreement." Carlos v. Philips Business Systems, Inc., 556 F. Supp. 769, 775-76 (E.D.N.Y. 1983).

Here, as in the Carlos case, the franchisor is arguing that it should be allowed to "change" the existing relationship.  This change, however, is closer to an indirect and constructive termination of the commission marketer agreement.  BP concedes that under the proposed lessee-dealer agreement option, Plaintiffs will no longer enjoy the protections of the Franchise Act. Instead, Plaintiffs would qualify under the Petroleum Marketing Practices Act ("PMPA") 15 U.S.C. § 2801 et seq.  Plaintiffs argue that they will be afforded fewer protections under the PMPA. The PMPA offers franchisors several more acceptable grounds for terminating a franchise agreement:

> (2)  For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:
>
> (A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure....
>
> (B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if–
>
> (C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such

occurrence...

(3) For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if–

(B) The receipt of numerous bona fide customer complaints by the franchisor concerning the franchisee's operation of the marketing premises, if--

(1) the franchisee was promptly apprised of the existence and nature of such complaints following receipt of such complaints by the franchisor; and

(ii) if such complaints related to the condition of such premises or to the conduct of any employee of such franchisee, the franchisee did not promptly take action to cure or correct the basis of such complaints.

(C) A failure by the franchisee to operate the marketing premises in a clean, safe, and healthful manner, if the franchisee failed to do so on two or more previous occasions and the franchisor notified the franchisee of such failures.

(D) In the case of any franchise entered into prior to June 19, 1978, (the unexpired term of which, on such date, is 3 years or longer) and, in the case of any franchise entered into or renewed on or after such date (the term of which was 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business, if--

(I) such determination is--

(I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(II) to materially alter, add to, or replace such premises,

(III) to sell such premises, or

(IV) that renewal of the franchise relationship is likely to be

9

> uneconomical to the franchisor despite any reasonable changes or
> reasonable additions to the provisions of the franchise which may
> be acceptable to the franchisee;

15 U.S.C. §2802.

That a franchise is uneconomical, or receives customer complaints, etc. are not reasons contemplated by the Franchise Act as sufficient justifications for the termination of a franchise relationship. Therefore, removing protections from the Plaintiffs and providing increased justifications for the decision to terminate the relationship by Defendant is an indirect termination of the agreement according to the Franchise Act.

This Court noted during oral argument that Defendant acknowledged that the Franchise Act will be replaced by the PMPA after the termination of the commission marketer agreement. BP suggests that the new arrangement will merely change the way that their product will be distributed to the dealers and that the PMPA is just as protective of Plaintiffs as the Franchise Act. This argument, however, ignores the fact that the result of the change in the relationship is irrelevant; a termination under the Franchise Act will occur. In effect, BP is attempting to achieve, indirectly, what it cannot achieve under the Franchise Act. "A franchisor is not permitted to accomplish a termination by indirect means that it would not be permitted to accomplish by direct means." Carlo C. Gelardi Corp. v. Miller Brewing Co., 502 F. Supp. 637, 653 (D.N.J. 1980). Plaintiffs have sufficiently shown a likelihood of success on the merits of their claim of termination under the Franchise Act.

C.    Irreparable Harm

To prevail on an application for injunctive relief, the moving party must demonstrate that he or she is likely to suffer irreparable harm in the absence of such relief. Destruction or

10

significant impairment of the subject matter of the litigation constitutes irreparable harm. Coleman v. Wilson, 123 N.J. Super. 310 (1973).  It is axiomatic that purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement.  Frank's GMC Truck Ctr. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988).  "In some cases, however, the loss of business and good will, and the threatened loss of the enterprise itself, constitute irreparable injury to the plaintiff sufficient to justify the issuance of a preliminary injunction." Beilowitz v. General Motors Corp., 233 F. Supp.2d 631, 644 (D.N.J. 2002) (citing Carlo C. Gelardi Corp. v. Miller Brewing Co., 421 F. Supp 233, 236 (D.N.J. 1976); see also Semmes Motors Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970) ("[T]he right to continue a business in which [Plaintiff] had engaged for twenty years...is not measurable in monetary terms.").

In Atlantic City Coin, Plaintiffs brought a claim under the Franchise Act, alleging wrongful termination of the franchise by the franchisor without good cause and moved for a preliminary injunction to maintain the *status quo*.  14 F.Supp. 2d at 646.  The Court granted Plaintiff's application for preliminary restraints finding that Plaintiffs would suffer irreparable harm if restraints were not entered.  Id. At 666-69.  In that case, the Plaintiffs sold, distributed and promoted Defendant's products and received commissions from Defendant on each sale.  Id. At 647.

When Defendant determined to terminate the franchise without good cause, Plaintiffs sought a preliminary injunction alleging that the termination would violate the Act.  Id. At 646. In granting the preliminary injunction Judge Brotman found that the Plaintiffs would suffer irreparable harm if the relationship were terminated because the loss of Plaintiff's goodwill and

11

longstanding business could not be adequately compensated by money damages. Id. At 666-69. Specifically, Judge Brotman ruled that the Plaintiffs were entitled to injunctive relief because the Plaintiffs' loss of goodwill and their longstanding business constituted irreparable harm. Id. At 668-69; see also Bateman v. Ford Motor Co., 302 F.2d 63, 66 (3d Cir. 1962) ("a judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who, as here, has had a Ford franchise for many years").

Here, as in Atlantic City Coin, Bateman and Belowitz, Plaintiffs face irreparable harm since they face the loss of their business if they do not accept BP's options which are in violation of the Franchise Act and contain a questionable financial outlook for Plaintiffs. A judgment for damages, years from now, may not redress the damage wrought. In inviting a suit for damages, BP can stall and outlast these Plaintiffs with far greater resources to push this matter to conclusion. This Court agrees that the potential loss or destruction of one's business constitutes irreparable harm.

D.     Balance of Harms

The third element of the analysis requires the Court to assess whether granting the preliminary injunction would harm BP more than denying the relief would harm Plaintiffs. See Tenafly Eruv Ass'n. Inc. v. Brough of Tenafly, 3098 F.3d 144, 157 (3d Cir. 2002).

BP's actions threaten Plaintiffs' ability to continue as profitable businesses and perhaps the loss of their business altogether. This interest has been well recognized by the State of New Jersey in that the Franchise Act itself limits the circumstances under which a franchise may be terminated to good cause only. BP, on the other hand, has not articulated a comparable hardship it would suffer were its termination of the franchises with Plaintiffs delayed.

12

After considering all of the factors, the balance of hardships weighs in favor of Plaintiffs. A delay in switching from commissioner marketer agreements to lessee-dealer agreements may result in a smaller profit margin for BP in the immediate future. Allowing BP to institute the change now may result in operational losses for some Plaintiffs and may force other Plaintiffs to close their businesses permanently.

  E.  <u>The Public Interest</u>

The fourth and final prong of the test for preliminary relief is whether granting such relief would serve the public interest. <u>Id</u>. at 157. The Franchise Act was passed because "distribution of sales through franchise arrangements in the State of New Jersey vitally affect the general economy of the State, the public interest and the public welfare." <u>N.J.S.A.</u> 56:10-2. Moreover, the Franchise Act "reflects the legislative concern over long-standing abuses in the franchise relations, particularly provisions giving the franchisor the right to terminate, cancel or fail to renew the franchise." <u>Shell Oil Co. v. Marinello</u>, 63 <u>N.J.</u> 402, 409 (1973), <u>cert</u>. <u>denied</u>, 415 <u>U.S.</u> 920 (1974).

In <u>Marinello</u>, the court observed that "the public is affected in a direct way beyond question" by agreements giving oil company franchisors with "disproportionate bargaining power" the right to terminate its franchisees "almost at will." <u>Marinello</u>, 63 <u>N.J.</u> at 408-09. "We live in a motor vehicle age. Supply and distribution of motor vehicle fuels are vital to our economy. In fact, the Legislature has specifically concluded that the distribution and sale of motor fuels within this State is affected with a public interest." <u>Id</u>. (<u>citing</u> <u>N.J.S.A.</u> 56:6-19©).

Thus, an injunction precluding the termination of the Plaintiffs' franchises promotes the policies behind the Franchise Act and thereby furthers the public interest.

13

## CONCLUSION

Based on the foregoing, the application for a preliminary injunction by Plaintiffs is

**granted.**

DENNIS M. CAVANAUGH, U.S.D.J.

Dated:        September 15, 2006

Original:     Clerk's Office

Copies:       All Counsel of Record

              File

14